# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| JOSEPH P. MILCHAK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:15-cv-00663-JAR |
| ) | |
| ASHTON B. CARTER, ) | |
| Secretary of Defense, ) | |
| Department of Defense, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant Ashton B. Carter's motion for summary judgment (Doc. 33). The matter is fully briefed and ready for disposition. For the following reasons, the motion will be granted.

### I. Background

In this civil action, Plaintiff Joseph P. Milchak asserts three claims for relief. First, he alleges that Defendant discriminated against him based on his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. Second, he claims that Defendant violated Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq., by failing to accommodate his need for a second-shift work schedule, and discriminating against him based on his association with his wife who is physically disabled. Third, he alleges that Defendant breached a settlement agreement that the parties reached after he filed an informal charge of discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq. ("settlement-agreement claim") (Doc. 1).

The summary judgment evidence establishes the following. Plaintiff was born in 1943, and started working for the National Geospatial-Intelligence Agency ("NGIA") in January 1985 (Doc. 34.3 at 3, 6). In 2009 and 2010, he was employed as a Digital Image Specialist working second shift in the NGIA's Edit Department, which is also known as EGMM (Id. at 6-7). Vernon Grothoff was Plaintiff's first line supervisor, and Patricia Dickens was his second line supervisor (Id.; Doc. 34.6).

In November 2009, Plaintiff heard a rumor that EGMM's second shift was going to be eliminated (Doc. 34.3 at 9-10). According to Plaintiff, he approached Dickens at that time to discuss a potential transfer to a new department in the NGIA, the St. Louis Information Library ("STIL"); that Dickens told him "he was not going to be able to work there" because Dickens wanted "longevity" in the new STIL positions[1]; and that Plaintiff could instead transfer to a second-shift position in Gateway, another NGIA department, if his second-shift position with EGMM was eliminated (Id. at 9-13; Doc. 43.1 at 4).

It is undisputed that, in December 2009, Dickens sent an email to all EGMM employees, including Plaintiff, informing them that STIL would become operational, and associated training would begin, in March 2010; stating that there would be positions available during all three work shifts; formally seeking volunteers to transfer to STIL; and asking that interested employees submit their names and shift preferences by December 17, 2009 (Doc. 34.3 at 10-12; Docs. 34.7, 34.8). It is also undisputed that a position in STIL would have been a lateral transfer for Plaintiff

---

[1] During his deposition, Plaintiff testified that Dickens did not mention anything about "longevity" or age during the November 2009 conversation (Doc. 34.3 at 27). In his answers to interrogatories and brief opposing Defendant's summary judgment motion, Plaintiff alleges that Dickens explained that she did not want him to transfer to any of the new STIL positions because she wanted "longevity" in those positions (Docs. 42, 43, 43.1 at 4). For purposes of this motion, the Court will assume without deciding that Dickens stated that she did not want Plaintiff to transfer to STIL because she wanted "longevity" in those positions.

(Doc. 34.3 at 27). Plaintiff did not reply to Dickens's December 2009 email by December 17, 2009 (Id. at 12).

In January 2010, Grothoff emailed Plaintiff and other EGMM second-shift employees, informing them that the EGMM's second shift would be eliminated in the next few months as a result of "recapitalization of the Digital Transformation equipment, personnel movement to [STIL], and workstation availability on first shift." (Doc. 34.9). In his email, Grothoff again sought volunteers to transfer to STIL, noted that there was still one second-shift position available in STIL, and directed employees who were interested in volunteering to transfer to STIL to communicate their interest to their supervisor by January 28, 2010 (Id.; Doc. 34.3 at 13). Plaintiff did not email Dickens or Grothoff to express interest in transferring to STIL by January 28, 2010 (Docs. 34.5, 34.7, 34.10).

On February 8, 2010, Dickens informed eight second-shift EGMM employees, including Plaintiff, that they would be reassigned to EGMM's first shift on either March 15, 2010 or April 26, 2010, based on their seniority and equipment availability; Plaintiff was directed to report to first shift on March 15, 2010 (Docs. 34.6, 34.11). On February 16, 2010, Plaintiff emailed Grothoff, indicating that he had not requested a STIL position because he was "planning to be retired before the STIL goes into operation." Plaintiff also provided a third EGMM supervisor a note from his wife's physician which stated that Plaintiff's wife needed him to take care of her until 4:30 p.m. each day; and requested an accommodation from NGIA based on his wife's medical condition (Docs. 34.3 at 7, 16; 34.12). Plaintiff was able to perform the essential functions of his job, whether on first or second shift; his accommodation request was based on his need to attend to his wife's medical needs during the day, which conflicted with a first-shift work schedule (Doc. 34.3 at 21-22). On February 18, 2010, Grothoff notified Plaintiff that his

accommodation request had been denied under the NGIA's "Reasonable Accommodation Program" because the program was only available to employees who themselves had disabilities (Doc. 34.13).

Plaintiff—along with three of his colleagues from EGMM's second shift—reported to first shift in the EGMM on March 15, 2010, as scheduled (Docs. 34.3 at 17; 34.5; 34.6). Plaintiff performed the same job he had performed on second shift, and he received the same pay and benefits (Doc. 34.3 at 17). From March 14, 2010 until March 30, 2010, Plaintiff worked partial days, using sick leave to cover the remainder of each shift (Id. at 17-18). He did not inquire about other second-shift or third-shift positions in NGIA, nor did he invoke his rights under the Family Medical Leave Act. Plaintiff had unused paid annual leave when he retired (Id. at 18). On March 31, 2010, Plaintiff retired (Id. at 8).

On April 26, 2010, two more of Plaintiff's former colleagues from EGMM's second shift transitioned to EGMM's first shift (Docs. 34.5; 34.6). In total, four employees from EGMM's second shift applied and were selected for second-shift positions in STIL (Docs. 34.5, 34.6, 34.7). Three of those employees completed STIL training and transferred to STIL; one employee did not complete the training, and instead was reassigned to first shift (Doc. 34.6).

Plaintiff did not email Dickens to volunteer for STIL. He also did not ask Dickens about transferring to Gateway, and no one told him that there was not a position for him in Gateway (Docs. 34.3 at 25; 34.7; 43 at 1). According to Plaintiff, he did not formally apply for a position in STIL because Dickens had told him in November 2009 that she did not want him in STIL, and he assumed there were no positions available in Gateway after he received Grothoff's February 2010 email directing him to report for first shift in EGMM (Docs. 34.3 at 9-10, 25; 43 at 1).

Before he retired, Plaintiff filed an informal complaint of discrimination, and the parties participated in mediation of that complaint in July 2010. Plaintiff claims that, during the mediation, Dickens offered him any of three open positions with NGIA and that he agreed to accept any of the positions. According to Plaintiff, the parties arrived at an agreement to settle his informal complaint during the mediation, but Defendant thereafter breached the agreement when Dickens told him there were no positions for him at NGIA (Id. at 28). On August 16, 2010, Plaintiff filed a formal complaint of discrimination, alleging that Defendant had discriminated against him based on his age and his wife's medical condition; his complaint was administratively denied (Docs. 34.3 at 18; 34.15; 34.17).[2] On April 15, 2015, Plaintiff filed suit in this Court (Doc. 1). Defendant now moves for summary judgment (Docs. 33, 38, 44). Plaintiff opposes the motion (Docs. 42-43).

## II. Summary Judgment Standard

The Court may grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Peterson v. Kopp, 754 F.3d 594, 598 (8th Cir. 2014). A moving party bears the burden of informing the Court of the basis of its motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences must be drawn in his favor.

---

[2] Plaintiff also alleged that Defendant had discriminated against him based on his sex, but

Celotex, 477 U.S. at 331. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

### III. Analysis

#### A. Plaintiff's ADEA Claim

Plaintiff alleges that Defendant discriminated against him based on his age, in violation of the ADEA, by failing to transfer him to STIL or Gateway, reassigning him to the first-shift in EGMM instead, and constructively discharging him. The Court will address each of these bases for Plaintiff's ADEA claim, in turn.

##### 1. Failure to Transfer Plaintiff to STIL or Gateway

Plaintiff alleges that Defendant discriminated against him in violation of the ADEA by failing to transfer him to a second-shift position with STIL based on his age. In order to establish a prima facie case of age discrimination based a denial of a request for a transfer, a plaintiff must show (1) that he was a member of a protected class; (2) that he requested a transfer to a position for which he was qualified; (3) that his request was denied despite his qualification for the position; and (4) that the position was filled by a person sufficiently younger than the plaintiff to permit an inference of age discrimination. Tusing v. Des Moines Ind. Comm. Sch. Dist., 639 F.3d 507, 515, 520-21 (8th Cir. 2011); Kehoe v. Anheuser-Busch, Inc., 96 F.3d 1095, 1105 n.13 (8th Cir. 1996); cf. Green v. City of St. Louis, Mo., 507 F.3d 662, 666 (8th Cir. 2007) (to establish prima facie claim for discriminatory failure to hire, plaintiff must show that "he applied

---

he has since abandoned that claim (Docs. 1; 34.3 at 27-28; 34.15).

and was qualified for a job for which the employer was seeking applicants"). Defendants do not dispute that Plaintiff was a member of a protected age group, that he would have been qualified for positions in STIL and Gateway, or that he was not selected for a position in either of those units. Rather, Defendants assert that Plaintiff did not apply for a position with STIL or Gateway; and that the positions in STIL and Gateway were not filled by people sufficiently younger than Plaintiff to give rise to a reasonable inference of age discrimination.

The Court concludes that Plaintiff has not established a prima facie case of age discrimination based on Defendant's failure to select him for a position in STIL or Gateway. Plaintiff concedes he did not formally apply for transfer to a STIL position by replying either to Dickens's December 2009 email or Grothoff's January 2010 email; he also concedes that he never applied for a position in Gateway. He instead argues that he did not apply for a STIL position based on his November 2009 conversation with Dickens, wherein she allegedly dissuaded him from applying for upcoming positions in STIL because she wanted "longevity" in those new positions.

"Victims of gross and pervasive discrimination are not required to apply formally for a position if they can establish that the employer's discriminatory practices deterred them from applying for a job." E.E.O.C. v Audrain Health Care, Inc., 756 F.3d 1083, 1087 (8th Cir. 2014) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 367-68 (1977)). However, "an employee who does not formally apply must make 'every reasonable attempt to convey his [or her] interest in the job to the employer' before he or she may prevail on a discrimination claim." Id. (quoting Lockridge v. Bd. of Trs. of Univ. of Ark., 315 F.3d 1005, 1011 (8th Cir. 2003) (en banc)); see also Jackson v. United Parcel Serv., Inc., 643 F.3d 1081, 1086 (8th Cir. 2011). The Court concludes that the record establishes beyond genuine dispute that Plaintiff did not apply

7

for a transfer to STIL or Gateway and that he did not make "every reasonable attempt to convey" his interest in a position in STIL. Plaintiff had a single conversation with Dickens in November 2009, before the STIL vacancies formally opened. It is undisputed that he did not respond to her December 2009 email seeking volunteers for the STIL positions or to Grothoff's January 2010 follow-up email, which again solicited volunteers to transfer to STIL and which informed Plaintiff that at least one vacancy for a second-shift STIL position was still available. Plaintiff instead responded to Grothoff's February 2010 email—which notified him that he would be reassigned to the EGMM's first shift in March 2010—stating that he had not volunteered to transfer to STIL because he intended to retire before the date he believed STIL would become operational. Thus, even assuming that Plaintiff expressed interest in transferring to STIL during his November 2009 conversation with Dickens and that Dickens dissuaded him from applying because she wanted "longevity" in those positions, the record nevertheless establishes that Plaintiff did not make every reasonable effort to convey his interest in transferring to a second-shift STIL position. The Court therefore concludes that Plaintiff has not established a prima facie claim of age discrimination under the ADEA based on Defendant's failure to transfer him to STIL or Gateway.

### 2. Plaintiff's Reassignment to EGMM's First Shift

A plaintiff may also establish a prima facie case of discrimination under the ADEA by showing that (1) he is a member of a protected age group; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he was demoted or transferred; and (4) he was replaced by a younger person. Fisher v. Pharmacia & Upjohn, 225 F.3d 915, 919 (8th Cir. 2000). "A transfer constitutes an adverse employment action when the transfer results in a significant change in working conditions or a diminution in the transferred employee's title,

salary, or benefits." Id. Plaintiff concedes that his first-shift position in EGMM was a lateral transfer. He performed the same job—albeit during different hours—after he was reassigned to first shift. Plaintiff has not identified any change in his working conditions or diminution in his title, salary, or benefits, and nothing in the record suggests that his working conditions changed as a result of his transfer. [3] See id. (transfer to a new position can constitute adverse employment action if it results in significant change in working conditions or diminution in title, salary, or benefits).

Moreover, even if the Court were to assume that Plaintiff's transfer to first-shift in EGMM was an adverse employment action, the Court would nevertheless conclude that Defendant is entitled to summary judgment, as the record establishes beyond genuine dispute that Plaintiff's transfer to first-shift was not discriminatory. To the contrary, the record establishes that Defendant eliminated EGMM's second shift in its entirety, and that all EGMM second shift employees were required either to transition to first shift in EGMM or to transfer to other positions within the NGIA. The record also establishes that the EGMM second shift was eliminated for fiscal reasons, and that all EGMM second-shift employees who had not transferred to other positions by their assigned deadline (which were determined by seniority) were transferred to EGMM's first shift. Plaintiff has adduced no evidence that his age was a "but-for" cause of the elimination of his second-shift position or his resulting transfer to first shift. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177 (2009) (to establish a disparate-treatment claim under ADEA, plaintiff must show that his age was a "but-for" cause of an adverse employment action); see Tramp v. Assoc. Underwriters, Inc., 768 F.3d 793, 801 (8th Cir. 2014)

---

[3] EGMM employees who worked second shift were paid a 10% bonus, which Plaintiff no longer received after he was reassigned to first shift. Plaintiff does not argue that this decrease in pay amounted to an adverse employment action.

(there can be no discrimination under the ADEA when the employer's decision is wholly motivated by factors other than age). The Court will thus grant summary judgment in Defendant's favor to the extent Plaintiff's ADEA claim is based on the elimination of his second-shift position or his subsequent reassignment to EGMM's first shift.

### 3. Constructive Discharge

Plaintiff alleges that Defendant constructively discharged him by transferring him to a first-shift position. In response, Defendant argues that Plaintiff failed to administratively exhaust his constructive discharge claim, and denies that Plaintiff was constructively discharged. The ADEA requires plaintiffs to file complaints with the EEOC before commencing suits in federal court. 29 U.S.C. § 626(d)(1). "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice that must be individually addressed before the EEOC." Sellers v. Deere & Co., 791 F.3d 938, 943 (8th Cir. 2015) (quoting Richter v. Advance Auto Parts, Inc., 686 F.3d 847, 851 (8th Cir. 2012) (per curiam)) (internal quotation marks omitted). Although administrative charges are to be liberally construed for the purpose of determining whether a plaintiff has exhausted his remedies, "there is a difference between liberally reading a claim which lacks specificity, and inventing, ex nihilo, a claim which simply was not made" in the charge. Parisi v. Boeing Co., 400 F.3d 583, 585-86 (8th Cir. 2005) (quoting Shannon v. Ford Motor Co., 72 F.3d 678, 684 (8th Cir. 1996)). Each of Plaintiff's alleged adverse employment actions are discrete acts that should have been separately presented to the EEOC; however, his administrative charge does not reference Plaintiff's working conditions once he was transferred to EGMM's first shift, nor does it make any claim that he was constructively discharged. Plaintiff is therefore prohibited from alleging that Defendant constructively discharged him. Id.

10

The Court further concludes that—notwithstanding Plaintiff's failure to exhaust his constructive discharge claim—Defendant would nevertheless be entitled to summary judgment on the merits of the claim. To make out a claim of constructive discharge, an ADEA plaintiff must show that "a reasonable person would have found [his] working conditions intolerable" and that his supervisor "intended to make [him] resign or, at a minimum, that [his] resignation was reasonably foreseeable given the conditions under which [he] was working." Betz v. Chertoff, 578 F.3d 929, 936 (8th Cir. 2009) (citing Reedy v. Quebecor Printing Eagle, Inc., 333 F.3d 906, 910 (8th Cir. 2003)). As discussed above, Plaintiff does not claim that his working conditions in EGMM's first shift were materially different than the conditions he sought to maintain from his previous second-shift position, and nothing in the record suggests that Plaintiff's working conditions in the first shift were "intolerable." Id. As such, Defendant is entitled to summary judgment on the merits of Plaintiff's constructive discharge claim.

### B. Plaintiff's Claim under the Rehabilitation Act

#### 1. Plaintiff's Claim of Disability-Association Discrimination

Plaintiff contends that Defendant violated the Rehabilitation Act by discriminating against him based on his association with his disabled wife. In response, Defendant argues that Plaintiff has not established a prima facie claim of disability-association discrimination. To establish a claim of disability-association discrimination under the Rehabilitation Act, Plaintiff must establish (1) that he was subjected to an adverse employment action; (2) that he was qualified for the job; (3) that Defendant knew at the time that his wife had a disability; and (4) the adverse employment action occurred under circumstances that raise a reasonable inference that his wife's disability was a determining factor in Defendant's decision. Hilburn v. Murata Elect. N. Am., Inc., 181 F.3d 1220, 1230-31 (11th Cir. 1999).

For the same reasons set forth above in the Court's analysis of Plaintiff's ADEA-discrimination claim, the Court concludes that Plaintiff has failed to establish that he suffered an adverse employment action that was motivated by a discriminatory animus, and that Defendant is thus entitled to judgment as a matter of law. Celotex, 477 U.S. at 331. More specifically, the Court concludes that Plaintiff did not suffer an adverse employment action because he did not apply for a transfer to STIL or Gateway, his transfer to EGMM's first shift did not cause a material change in his conditions of employment, and he was not constructively discharged; and that Plaintiff has failed to show that the elimination of EGMM's second shift was driven by anything other than fiscal concerns.[4] Accordingly, summary judgment will be granted in Defendant's favor on Plaintiff's ADEA claim of disability-association discrimination.

### 2. Plaintiff's Failure to Accommodate Claim

Plaintiff further alleges that Defendant violated the Rehabilitation Act by failing to provide him a reasonable accommodation, i.e., a second-shift work schedule, based on his association with his disabled wife. In response, Defendant argues that the Rehabilitation Act does not require employers to accommodate non-disabled employees based on their associations with persons with disabilities. The Court concludes that Defendant is entitled to judgment as a matter of law on Plaintiff's failure-to-accommodate claim, as the Rehabilitation Act does not require employers to accommodate a non-disabled employee based upon his association with a

---

[4] In support of his disability-association discrimination claim, Plaintiff appears to point to an EGMM second-shift employee who was not required to transition to EGMM's first shift pursuant to the aforementioned seniority schedule, but who was instead permitted to transition to first shift over the course of several weeks based on her own physical disability. According to Plaintiff, Defendant's willingness to accommodate this other second-shift employee supports a reasonable inference that Defendant discriminated against him, based on his association with his wife, by failing to provide him the same accommodation. The Court disagrees, as the employee's second-shift position was also eliminated, she too was required to transfer to EGMM's first-shift, and her accommodation was based on her own disability pursuant to the ADA.

person with a disability. Coffman v. QC Fin., No. 8:07cv427, 2008 WL 4104676, at *2 (D. Neb. Aug. 29, 2008); Den Hartog v. Wasatch Acad., 129 F.3d 1076, 1084 (8th Cir. 1997) (Americans with Disabilities Act ("ADA") does not require employers to provide accommodations to non-disabled employees based on their association with disabled person); cf. Allison v. Dep't of Corrs., 94 F.3d 494, 497 (8th Cir. 1996) (Eighth Circuit decisions interpreting the ADA also apply to Rehabilitation Act). More specifically, the Rehabilitation Act does not require an employer to modify an employee's work schedule to accommodate the employee's need to care for a family member with a disability. See 29 C.F.R. § 1630.8 app. at 381) ("[A]n employer need not provide the applicant or employee without a disability with a reasonable accommodation because that duty only applies to qualified applicants or employees with disabilities. Thus, for example, an employee would not be entitled to a modified work schedule as an accommodation to enable the employee to care for [a family member] with a disability."); Den Hartog, 129 F.3d at 1084. Accordingly, the Court will grant summary judgment in Defendant's favor on Plaintiff's claims under the Rehabilitation Act.

### C. Settlement-Agreement Claim

Finally, Plaintiff claims that Defendant breached a Title VII settlement agreement the parties reached during mediation of his informal charge of discrimination. In response, Defendant argues that the Court lacks jurisdiction over Plaintiff's settlement-agreement claim; and alternatively, that Plaintiff failed to administratively exhaust it. Initially, the Court notes that "[c]ourts around the country have split over whether federal courts have jurisdiction over lawsuits alleging that the government breached settlement agreements disposing of Title VII claims." Gerdes v. Chertoff, 2009 WL 2351742, at *1-2 (D. Neb. July 24, 2009) (quoting Petrie v. Sec'y Dep't Veterans Affairs, No. 2:06cv01301, 2009 WL 366628, at *1-2 (S.D. Ohio Feb.

11, 2009). The United States Court of Appeals for the Eighth Circuit has not directly addressed this jurisdictional issue. In Harris v. Brownlee, 477 F.3d 1043 (8th Cir. 2007), the Eighth Circuit Court of Appeals resolved an appeal from a district court's grant of summary judgment on the merits of a claim in which the plaintiff sought to enforce a Title VII settlement agreement. The Eighth Circuit affirmed the district court's grant of summary judgment without specifically addressing whether the district court had jurisdiction. Id. at 1047-48. Plaintiff urges the Court to conclude that, by proceeding to the merits of the appeal in Harris, the Eighth Circuit implicitly held that the district court had jurisdiction over the plaintiff's settlement-agreement claim. Defendant opposes such a reading of the Eighth Circuit's opinion in Harris.

The Court need not resolve this issue, because, even assuming that federal courts have jurisdiction over claims alleging breach of Title VII settlement agreements, Plaintiff is nevertheless barred from bringing his settlement-agreement claim in federal court, as he did not administratively exhaust the claim. See Richeter v. Advance Auto Parts, Inc., 686 F.3d 847, 850-53 (8th Cir. 2012) (per curiam) (Title VII plaintiffs are required to exhaust administrative remedies before filing suit in federal court); Dotson v. Donohoe, 4:11-cv-1820-NAB, 2013 WL 171025, at *9-10 (E.D. Mo. Jan. 16, 2013) (granting summary judgment in defendant federal agency's favor on Title VII settlement-agreement claim where plaintiff failed to contact the EEO director about alleged breach). When a plaintiff believes that a federal agency has failed to comply with the terms of a Title VII settlement agreement, he "shall notify the EEO Director, in writing, of the alleged noncompliance within 30 days of when the [plaintiff] knew or should have known of the alleged noncompliance." 29 C.F.R. § 1614.504(a).[5] Plaintiff does not dispute that

---

[5] In an EEO administrative proceeding, a plaintiff may seek to have the terms of a Title VII settlement agreement specifically enforced or to have his complaint reinstated for further processing from the point processing ceased. 29 C.F.R. § 1614.504(a). The Court notes that

14

he did not contact the EEO Director within thirty days after he learned that Defendant had breached the purported settlement agreement. Plaintiff appears to argue that he should be excused from Title VII's exhaustion requirement because it would have been futile for him to file an administrative charge seeking to require Defendant to comply with the terms of the settlement agreement. The Court disagrees. Plaintiff filed his formal discrimination charge, including only his ADEA and Rehabilitation Act claims, shortly after he learned that he would not be rehired by Defendant. Bailey v. U.S. Postal Serv., 208 F.3d 652, 655 (8th Cir. 2000) (plaintiff was not excused from her failure to comply with Title VII exhaustion requirements where record showed she was aware of the requirements and nothing suggested that defendant had prevented her from complying with them). Nothing in the record suggests that Plaintiff could not have included his settlement-agreement claim in his formal charge, or that Defendant would not have addressed the claim had Plaintiff made it. Therefore, Plaintiff failed to exhaust his administrative remedies as to his settlement-agreement claim, and Defendant is thus entitled to summary judgment.

## IV. Conclusion

Accordingly, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED** (Doc. 33). A separate judgment will accompany this order.

---

Plaintiff was permitted to proceed with his administrative complaint, which the agency ultimately resolved on the merits, albeit in Defendant's favor; thus, Plaintiff has already been provided one of the remedies available to him had he exhausted his administrative remedies.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**

Dated this 26th day of October, 2016.